IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


DAVID M. PARRISH,

                    Plaintiff,

v.                                                          Civil Action No. 2:04-CV-93

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
                    Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

     Plaintiff, David M. Parrish, (Claimant), filed his Complaint on December 10, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on March 8, 2005.[2]  Claimant

filed his Motion for Summary Judgment on March 31, 2005.[3]  Commissioner filed her Motion for

Summary Judgment and Memorandum in Support on April 28, 2005.[4]

B.    The Pleadings

          1.    Claimant's Motion for Summary Judgment.

--------

     [1] Docket No. 1.

     [2] Docket No. 3.

     [3] Docket No. 4.

     [4] Docket No. 6.

2. <u>Commissioner's Motion for Summary Judgment and Memorandum in Support</u>.

C.     <u>Recommendation</u>

1.     I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly decided that substantial evidence supports the Commissioner's Finding that Claimant was entitled to a closed period of disability from April 15, 2000 to June 5, 2001, but not thereafter.

## II. Facts

A.     <u>Procedural History</u>

On April 30, 2000, Claimant filed for Disability Insurance Benefits (DIB) and Supplemental Security Income payments alleging disability since April 15, 2000  The application was denied initially and on reconsideration. A hearing was held on March 18, 2003 before an ALJ. On March 18, 2003, Claimant filed a written request for closed period of disability from April 15, 2000 to September 1, 2002. On May 2, 2003, the ALJ issued his decision wherein Claimant was found to be disabled and entitled to a period of disability and DIB from April 15, 2000 through June 5, 2001, after which time the ALJ found Claimant "not disabled" through the end of the closed period requested of September 1, 2002. On June 24, 2003, the ALJ issued an amended decision, affirming and restating the partially favorable decision of May 2, 2003. The Appeals Council denied Claimant's request for review of the ALJ's decision on October 22, 2004. This action was filed and proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 27 years old on the date of the March 18, 2003 hearing before the ALJ.

Claimant has a high school education and one year of college and past relevant work experience as

a construction worker/laborer.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: June 5, 2001- September 1, 2002.

**Medical Report, Tracy L. Cosner-Shepherd, M.S. and Greg Trainor, M.A., 6/5/01, Tr. 627-635**
DIAGNOSTIC IMPRESSIONS:
AXIS I:          Dementia due to head trauma;
                 History of alcohol abuse;
                 Anxiety disorder, not otherwise specified.

AXIS II:         Deferred.

AXIS III:        Problems with right arm; stiffness and soreness in neck, hips, ankles, wrists, and
                 shoulders; weight loss; impaired smelling and taste senses; other physical
                 limitations due to automobile accident.

**Residual Functional Capacity Assessment, Physical, Dr. Hugh Brown, 6/6/01, Tr. 636-643**
EXERTIONAL LIMITATIONS:
Occasionally lift/carry: 20 pounds;
Frequently lift/carry: 10 pounds;
Stand and/or walk:  about 6 hours in an 8-hour workday;
Sit: about 6 hours in an 8-hour workday;
Push and/or pull: limited in upper extremities.

POSTURAL LIMITATIONS:
        Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally.

MANIPULATIVE LIMITATIONS:
Reaching all directions (including overhead), handling (gross manipulation), fingering (fine
manipulation), feeling (skin receptors): limited.

VISUAL LIMITATIONS:
None established.

COMMUNICATIVE LIMITATIONS:

3

None established.

ENVIRONMENTAL LIMITATIONS:
Hazards: avoid concentrated exposure.

**Mental Residual Functional Capacity Assessment, Joseph Kuznir, 6/19/2001, Tr. 644-647**
UNDERSTANDING AND MEMORY:
No evidence of limitation in this category.

SUSTAINED CONCENTRATION AND PERSISTENCE:
The ability to carry out very short and simple instructions/detailed instructions: no evidence of limitation in this category.
The ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual; to work with or proximity to others; to complete a normal work-day and workweek without interruptions: moderately limited.
The ability to sustain an ordinary routine without special supervision: not significantly limited.
The ability to make simple work-related decisions: no evidence of limitation in this category.

SOCIAL INTERACTION:
The ability to interact appropriately with the general public; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited.
The ability to ask simple questions or request assistance: no evidence of limitation in this category.
The ability accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them: moderately limited.

ADAPTATION:
The ability to respond appropriately to changes in the work setting: moderately limited.
The ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation in this category.
The ability to travel in unfamiliar places, use public transport; to set realistic goals or make plans independently of others: not significantly limited.

**Psychiatric Review Technique Form, Joseph Kuzniar, 6/19/2001, Tr. 648-661**
Organic Mental Disorders: Dementia due to head trauma.
Anxiety-Related Disorders: Anxiety d/o

RATING OF FUNCTIONAL LIMITATIONS
Restriction of Activities of Daily Living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace: moderate.
Repeated episodes of decompensation: one or two.

D.      Testimonial Evidence
1. Claimant

4

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 696-712):

A    Well, from the 15th of April until, I would say late-November, early-December, I couldn't walk at all. I had to have walker/wheelchair.

Q    And then, after that, let's say after the December period of time - -

A    It was until the end of summer that next year that I was able to walk without even limping real bad or anything.

Q    Okay. And do - - after the summer of 2001, were you able to do more walking?

A    Yeah.

Q    Okay. And how much further could you walk at that time? Let's say in June of 2001.

A    Twice as much as I could before.

Q    Okay.

A    - - and  [INAUDIBLE].

Q    Okay. And how long would that be?

A    I could walk up to Sheetz, and that was maybe two or three blocks.

Q    Two or three blocks. Okay.

A    Something like that. And then, after that, I'd have to sit down for awhile.

Q    Okay. And this is around June of 2001. After that, then, when did your walking ability get better?

A    Towards the end of the summer I guess.

Q    So that was September of 2001? At what point - - at that point, at the end of the

summer - - let's say September of 2001 - - how far could you walk then?

    A       A mile, maybe.

    Q       And how much could you lift at that point in time?

    A       Hardly anything?

    Q       Okay.

    A       Maybe - -

    Q       Help me a little bit.

    A       A gallon of milk - -

    Q       Okay.

    A       - - at the most, something like that.

    Q       Okay.  And in September of 2001 - - okay - - when you're walking that mile - -

okay - - you're able to walk a mile?  Or did you have to make some stops during the course of

that?

    A       Yes.

    Q       And how many stops would you have made?

    A       Three, four.

    Q       Okay.  And how long would it take you to walk about mile?

    A       [INAUDIBLE] I'd walk out to the track.  It's real close to the - -

    Q       Close to the - -

    A       - - my mother-in - -

    Q       - - school?

    A       Yeah.

Q        Okay.

A        And it would take a good half-hour or something - -

Q        Okay.

A        - - of walking - -

Q        Um-hum.

A        - - maybe a little longer.

Q        Okay.

A        40 minutes?

                         *                    *                    *

Q        After September of 2001 - - okay?  And if you can, bring that forward.  What I'm trying to do - - let's say after September of 2001, until September of 2002, did your ability to walk and to lift also increase from that time period?  Okay.

A        Yeah.

                         *                    *                    *

Q        Okay.  And then, how much did that increase?  In other words, today, just on a flat, level surface - - okay?   How far can you walk without stopping, today?  Well, let's say not today, but let's say as of the end of your closed period of disability that you're seeking.  As of September 1 of 2002, how far could you walk without stopping at that point in time?

A        About the same, pretty much.  I'd still get tired.

Q        Okay.

A        It still hurts.

Q        About a mile at that time, too.  Okay.

A        Hasn't got much better.

Q        Okay.  With less stops or - -

A        Yeah, just stop once or twice.

Q        Okay.  And how much lifting could you have done at that period of time, in - -

September 1, of 2002?

A        I could do about five push-ups.

                        *              *              *

Q        Now, taking that back, when did you move from only being able to lift ten pound,

which was by your testimony September of 2001, to September of 2002, being able to do the - -

you know, the five push-ups?

A        Just slowly - -

Q        Okay.

A        - - moving on, and - -

Q        All right.

A        - - therapy, stretching.

Q        Was there an in-between period?  Let's say six months after that, September of

2001, that you could point to that you could say that you could lift a certain amount of weight - -

A        No.

Q        - - or just gradually over the period of time?

A        Just gradually it got better.

Q        Okay.

A        Very slow.

Q       And as this period of time progressed, did your pain also get better?

A       Not really - -

Q       No?

A       - - no.

Q       Okay.  And during that period of time - - and you can alter it from 4/15 of 2000 to September 1 of 2002 - - can you categorize what your pain level would have been?  Just tell me - - one being the least amount of pain or no pain at all.

A       Five, something like that.

Q       Okay.

A       Yeah.

Q       Although I'm sure it was more than five on a scale of ten during the period that were immediately after surgery, though, right?

A       Yeah.

Q       But overall, it was a five.  Would that five level of pain be true from September of 2001?

A       [No audible response].

                          *                    *                    *

Q       During the period of time that - - before you went back to school, do you experience any problems with changes in weather or temperature?

A       Yeah.

Q       Could you describe that for the Judge?

A       Well, if it's getting ready to rain, my joints ache real bad, especially my hip and

my shoulder.

ALJ          You can tell in advance, right?

CLMT         Yeah - -

ALJ          I had some surgery; I can tell, too.

CLMT         Yeah.

ALJ          I'm like a weather vane.

CLMT         If it's real hot out, it doesn't make much of a difference when it's hot, but

when it gets cold, I can tell I have enough metal in me that it gets cold.

ALJ          All right.

ATTY         Did you recover your sense of smell and taste?

CLMT         No, not really.  A lot of my favorite foods I used to eat, I can't eat at all,

now, chocolate, pizza, all that.

ATTY         Why can't you eat those foods?

CLMT         It just tastes awful.  It's like a - - I don't know what, really.


## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr.

682-696 ):

ALJ    Back on the record.  What I'm going to do is allow counsel to have some

additional time here to just develop a little more in the way of medical evidence for him.  In this,

I'd like you to address a couple of hypotheticals for me for me, if you would.  Assume that

frequent is one-third to two-thirds of an eight-hour day; occasion [sic] is a little up to one-third

of an eight-hour day.  Moderate is defined to be at a level of severity that would preclude the

attention and concentration required for high-stress, production-oriented type of work, also complex work, but not of a level of severity or magnitude to preclude less stressful of an unskilled or semiskilled nature, involving simpler work instructions. The term simpler is used as it is customarily used in normal work rules. I am in no way referring to sheltered workshop type of work. The balancing I'm referring to is normal balancing, and not balancing as part of a work criteria. The hypotheticals are progressive in nature, unless directed otherwise. Consider an individual, younger by definition, high school education, prior work as stated, and considering the closed period of disability sought. Address the light and sedentary ranges. I'm really looking for low-stress, routine type of work, in other words, requiring no more than moderate attention and concentration and persistence and pace for prolonged periods. Assume he could only occasionally climb stairs and ramps and balance and stoop; and no kneeling, crouching or crawling; no climbing of ladders, ropes, and scaffolds; no hazardous heights; no hazardous, moving machinery; no exposure to extreme temperature changes. Assume that - - no concentration exposure to dust, fumes, chemicals, poor ventilation or excessive humidity or excessive wetness or vibration; no above-the-shoulder, upper extremity lifting, handling, reaching, or carrying; no lower extremity use of push, pull, control. Assume moderate pain for this hypothetical with moderate limitations with regard to performing activities within a schedule and maintaining regular attendance and being punctual, and also, working in coordination or proximity to others without distracting. When you get to number two, make it more restrictive. There, no prolonged walking and standing. I'll require a sit/stand option with no more than a half an hour sitting or standing at any one time, period. And number three - - he's right-hand dominant, I believe, counsel. Is that correct?

ATTY        Yes, I believe [INAUDIBLE].

ALJ        And what I'd like you to do is assume no repetitive right-hand dominant use. I'm not precluding all use of the dominant hand, but I'd like to constant, repetitive right-hand dominant use. When you get to four, make it a sit/stand option with no - - sit/stand being at the individual's sole discretion. And there, at four, I'd also like you to assume no repetitive bilateral hand-us, right or left; but again, I'm no precluding all hand usage. Five: elevate the pain level to above moderate to severe on a chronic, daily basis, and do that, also, for the nonexertionals that were identified in the prior hypotheticals. And if you need to, we can go off the record for a minute.

VE        Yes, just a moment, please.

ALJ        We'll go off - -

(At this point, the Administrative Law Judge went off the record.)

(On the record.)

ALJ        Mr. Lester, would you address the hypotheticals for me, if you would?

VE        Yes, sir. Addressing hypothetical number one, work available for such a hypothetical individual would work such as a cashier II, the simplest of the cashiering positions, 138,000 in the national economy, some 500 locally; work as a router, along with dispatch work, 60,000 nationally, some 300 locally; or work as an office helper, 77,000 nationally, some 350 locally. Sedentary, unskilled work available would include administrative-support work, such as an addresser, 62,000 nationally, 350 locally; an order clerk, specific to the food and beverage industry, 137,000 nationally, some 500 locally; and work as a document preparer, 65,000 nationally, some 300 locally. All of those jobs are consistent with the <u>Dictionary of</u>

<u>Occupational Titles</u>. The local numbers are considered - - or the local labor market is considered a 75-mile radius of Cumberland, Maryland; and they're all consistent with the <u>Dictionary of Occupational Titles</u> with the exception of the sit/stand option, which is not addressed by the <u>Dictionary of Occupational Titles</u>, and - - however, based on my knowledge and experience with the workplace, tasks and functions required for these jobs, it is typical that employers provide for a sit/stand option. Hypothetical number two would eliminate the light work. Hypothetical number three would reduce the sedentary work by ten percent. Hypothetical number four would reduce the remaining sedentary work by an additional ten percent. And in hypothetical number five, there would be no work available for such a hypothetical individual.

ALJ          All right. Thank you. Mr. Barr, anything?

ATTY         Yes - -

ALJ          Sure.

ATTY         If I may.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q     Mr. Lester, what's the date of the last edition of the <u>Dictionary of Occupational Titles</u>?

A     It was last published in 1991.

Q     No updates since then?

A     Not that I'm aware of.

Q     What does an order clerk do when they're not taking orders?

A     Generally, nothing; typically, nothing. There are tasks that might be assigned to that employee that would include things like some minor clean-up, some recording and reporting

of activities, things of that nature, all of an unskilled nature.

Q       Reporting and recording falls into unskilled work?

A       Well, reporting and recording are skills; however, it might require - - or they might require someone to count the money in the drawer, note how many clients or customers have been served and - - something of that nature.

ATTY        All right.

ALJ         You're not talking about any sophisticated - -

VE          No - -

ALJ         - - reporting - -

VE          - - sir.

ALJ         - - or recording?

VE          No, it is unskilled work.

ATTY        And an addresser?

VE          An addresser can do a variety of things from addressing envelopes to package to do some minor filing.  It's an administrative support position, usually pretty specific in terms of directives.

ATTY        How does one address their - - whatever they're addressing.

VE          It could be anywhere from a - - any number of ways.  Generally speaking and typically, it is performed using pre-printed address labels placed on a package or a file jacket, something of that nature.

ATTY        How does the addresser match the label with the package?

VE          Well, there's any number of ways.  It could be a one-on-one package that

comes down with a specific label; it could be similar packages - - or identical packages, I should say, with a page of labels that they'd peel off and stick on.

ATTY          If I can ask you to, consider, as part of the hypotheticals that there were posed to you, the information contained on the mental residual functional capacity assessment that's in the file, and I'll show you a copy of that.

ALJ          Do you want to go ahead and just use it?

ATTY          Pardon?

ALJ          It's part of the exhibit - - do you have the exhibit [INAUDIBLE]?

ATTY          I'm sorry, Judge, I don't have  the exhibit list    - -

ALJ          My copy is falling apart.

ATTY          - - but I'll be happy to [INAUDIBLE].

ALJ          Let's go off the record for a minute so we can do it.

          (At this time, the Administrative Law Judge went off the record.)

          (On the record.)

ALJ          Okay.  We can - -

ATTY          Thank you, Judge.  I'm referring to Exhibit 9F in the file.

ALJ          Why don't you take a look at that, Mr. Lester, and tell me the result of your considerations of that?

VE          Yes, sir.  There are a number of moderately limited - - limitations noted, and my response to that would be, in terms of productivity, if there's moderately limited - - limitations, impacting productivity to a level of greater-than-15 percent, most employers would not tolerate such a loss of productivity, and there would be no work available.

ALJ            Okay.

   E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life.

•      History of alcohol abuse.  (Tr. 634).

•      Watched the television.  (Tr. 697).

•      Read.  (Tr. 697).

•      Watched his son.  (Tr. 697).

•      Used his computer.  (Tr.  697).

•      Visited his grandmother (one block from his house).  (Tr. 698).

•      Watched movies.  (Tr. 698).

•      Did his son's laundry.  (Tr. 699).

•      September, 2001–could walk one mile with 3-4 stops.  (Tr. 701).

•      September, 2001–could lift a gallon of milk.  (Tr. 701).

•      September, 2001-could do five push-ups.  (Tr. 704).

•      Started school in September, 2000.  (Tr. 705).

•      Had a 2.8 GPA.. (Tr. 705).


**II.  The Motions for Summary Judgment**

A.      Contentions of the Parties

Claimant contends that the ALJ's decision that Claimant was not disabled after June 5, 2001

is not supported by substantial evidence.  Specifically, Claimant asserts that the ALJ (1) improperly

applied 20 C.F.R. § 404.1529 and SSR 96-7p when he analyzed Claimant's complaints of pain; and, (2) erred in determining Claimant's credibility.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly analyzed Claimant's complaints of pain in accordance with the regulations; and (2) properly determined Claimant's credibility.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

complete record." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).

10.     Social Security - Residual Functional Capacity.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

11.    Social Security - Subjective Complaints of Pain.  Claimant's statements alone are not enough to establish that there is a physical or mental impairment.  20 C.F.R. §§ 404.1528(a), 416.928(a).  Claimant's statement about her pain or other symptoms will not alone establish that claimant is disabled.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or lack thereof. Id. at 592 (citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)).

12.    Social Security - Claimant's Credibility - Pain Analysis.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

13.    Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

14.    Social Security - Vocational Expert.  Once it is established that a claimant cannot

perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

C.     Discussion

THE ALJ'S DECISION THAT CLAIMANT WAS NOT DISABLED AFTER JUNE 5, 2001 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

Claimant contends that the ALJ's decision that Claimant was not disabled after June 5, 2005 is not supported by substantial evidence.   The Commissioner counters that substantial evidence supports the Commissioner's finding that Claimant was entitled to a closed period of disability from April 15, 2000 to June 5, 2001, but not thereafter.

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520.  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. at § 404.1520(b).  If the claimant is not, the second inquiry is whether the claimant suffers from a severe impairment.  Id. at § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. at § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. at § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th

Cir. 1983), and leads to the fifth and final inquiry: whether the claimant has the residual functional capacity to perform other forms of substantial gainful activity, considering the claimant's age, education, work experience and impairments. Id.

It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

In his decision, the ALJ granted Claimant a closed period of disability. In a "closed period" case, the ALJ determined that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of the decision. Pickett v. Bowen, 833 F.2d 288, 289 (11th Cir. 1987). The ALJ found that claimant met his burden to show he was disabled between April 15, 2000 and June 5, 2001. (Tr. 23). The ALJ found that Claimant had not engaged in any substantial activity during this closed period. (Tr. 15, 21). He also found that Claimant had severe impairments, such as a number of orthopedic and neurological injuries, including trauma to the right brachial plexus. (Tr. 15, 21). The ALJ found that Claimant's medically determinable impairments did not meet or medically equal one of the listed impairment in Appendix 1, subpart P, Regulations No. 4. (Tr. 15, 21). The ALJ also found that Claimant's allegations regarding his limitations were "not fully credible." (Tr. 18, 21). With respect to Claimant's RFC, the ALJ found that during this closed period, Claimant had a residual functional capacity for less than a full range of sedentary work. (Tr. 18, 21). As a result, the ALJ found that Claimant was entitled to a period of disability between April 15, 2000 and June 5, 2001. (Tr. 23).

The ALJ further determined that as of June 5, 2001, Claimant "medically improved with surgery and therapy" and, therefore, Claimant has retained the residual functional capacity for sedentary and light exertional work. (Tr. 18, 22). Therefore, the ALJ found that Claimant was disabled within the meaning of the Act between April 15, 2000 and June 5, 2001, but not thereafter. (Tr. 23).

In this case, Claimant alleges that the ALJ improperly evaluated his subjective complaints of pain and limitations. Unfortunately for the Claimant, his argument is without merit. The determination of whether a person is disabled by pain is a two step process. First, the ALJ must consider whether there is objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ must consider the credibility of Claimant's subjective allegations of pain in light of the entire record. Id. at 595. The factors to be considered at Step Two include: (1) claimant's statements about pain; (2) claimant's medical history; (3) laboratory findings; (4) any objective medical evidence of pain; (5) claimant's daily activities; and (6) medical treatment to alleviate pain. Id.; 20 C.F.R. § 416.929(c).

In this case, the ALJ correctly applied the two step pain analysis. The ALJ conducted a comprehensive review of the medical evidence record. (Tr. 13-23). The ALJ found that the medical record shows that Claimant's "neurological and orthopedic impairments were quite severe." (Tr. 24, 27). This satisfies the first prong of the Craig test. In light of the medical record, the ALJ stated that "the claimant's subjective complaints regarding disabling pain and functional limitation are not fully credible concerning his condition as of June 5, 2001 and the

period following to the end of the closed period of disability sought as to a total preclusion from all work." (Tr. 18). The ALJ noted that Claimant's mental Capacity Evaluation, dated June 5, 2001, indicated that, despite head trauma sustained in a motor vehicle accident, Claimant demonstrated intellectual functioning within normal range, with verbal IQ of 94, performance of 107 and full scale IQ of 100. (Tr. 17).

As a result, the ALJ stated that "[t]he findings suggested that as of June 5, 2001 report date, the claimant could perform low stress routine work in coordination and proximity with others without distraction, and that his ability to maintain punctuality, attendance and scheduling is only moderately impaired." (Tr. 17). Furthermore, Claimant's physical residual capacity assessment, dated June 6, 2011, indicated that Claimant's primary diagnosis was status post trauma to the right brachial plexus. (Tr. 17). Dr. Brown opined that at that time Claimant could lift 20 pound occasionally and ten pounds frequently, stand six hours in a workday and sit about six hours in a workday with limited pushing and pulling ability in the right upper extremity. (Tr. 17). The ALJ concluded that "[t]he evidence of record supports this residual functional capacity, showing good response to surgery and post surgical therapy." (Tr. 17).

The ALJ further noted that Claimant's activities of daily living "were adequate; he did a moderate amount of cooking and cleaning, as well as daily reading, drawing and journal writing." (Tr. 17). Additionally, Claimant's concentration and pace were "only moderately deficient," persistence was only mildly deficient and memory function was within normal limits. (Tr. 17) . It was further noted that by June 1, 2001, Claimant was walking three blocks. (Tr. 18). By September 1, 2001, Claimant was walking for one mile and lifting ten pounds. Claimant also testified that his pain had significantly reduced during the period following June 5, 2001 (rated it

a five) and that he could do five push-ups. (Tr. 18). This satisfies the second prong of the Craig test.

Claimant claims that the ALJ failed to "articulate and analyze [Claimant's] complaints of pain," pursuant to 20 C. F. R § 404.1529 and SSR 96-7p. (Pl.'s Br. at 18-19). The Court disagrees. The ALJ found that Claimant's statements concerning his limitations and other symptoms lacked credibility because they were inconsistent with the evidence as a whole. The ALJ discussed the objective medical evidence in detail and applied the appropriate standard for evaluating a claimant's symptoms. See 20 C.F.R. § 404.1529. This regulation tells the adjudicator to consider the claimant's symptoms, but only to the extent they are consistent with objective medical evidence. Id. Because the subjective statements were inconsistent with the record as a whole, the ALJ acted according to the appropriate legal standard when he discounted Claimant's statements. See SSR 96-7p. Accordingly, the ALJ's decision was consistent with the law and supported by substantial evidence.

Claimant also alleges that the ALJ failed to "set forth any analysis" as to his conclusion that Claimant's allegations regarding his limitations were not fully credible. (Pl.'s Br. at 21). As stated above, it is the ALJ's responsibility to weigh the evidence, including medical evidence, in order to resolve any conflicts which might appear therein. Hays, 907 F.2d at 1456. In considering Claimant's credibility, the ALJ considered all of the evidence, including the physicians' opinions, Claimant's medical history and diagnoses, his subjective allegations of pain and limitations and his daily activities and found him not entirely credible. 20 C.F.R. § 404.1529; SSR 96-7p. (Tr. 13-23). Therefore, the ALJ properly assessed Claimant's credibility and adequately articulated the reasons behind his credibility finding.

Finally, Claimant relies on the vocational expert's testimony in response to the fifth hypothetical that an individual with limitations that have an impact on the productivity greater than fifteen percent would be unable to work. (Pl.'s Br. at 22). "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[5] "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981). The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. Russell v. Barnhart, No. 02-1201, 2003 U.S. App. LEXIS 2178 (4th Cir. Feb. 7, 2003).[5] The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe. Id. Finally, the ALJ has great latitude in posing hypothetical questions and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the ultimate question. Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at * 5 (4th Cir. Jan. 11, 1999).[6]

As previously discussed, the ALJ properly discounted the credibility fo Claimant's subjective allegations regarding his limitations in light of the entire record. The ALJ's hypothetical to the vocational expert incorporated Claimant's limitations that are supported by the

_____

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

record.  Accordingly, because the ALJ did not find that Claimant's limitations would cause a fifteen percent decrease in Claimant's productivity, he did not rely on this testimony.  (Tr. 20). Therefore, substantial evidence exists for the ALJ's decision that Claimant has retained the residual functional capacity for sedentary and light exertional work.  (Tr. 18, 22).

## IV.  Recommendation

For the foregoing reasons,  I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision.  Specifically, the ALJ properly decided that substantial evidence supports the Commissioner's Finding that Claimant was entitled to a closed period of disability from April 15, 2000 to June 5, 2001, but not thereafter.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 13, 2006

/s/ James E. Seibert
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE